IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

MITCH GOREE,

       Plaintiff,

v.                                                             No. 05-2393 B/V

UNITED PARCEL SERVICE, INC,
TOM RAGLAND, in his individual capacity,
and DANIEL MINESINGER, in his
individual capacity,

       Defendants.

_____

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND
DISMISSING THE COMPLAINT WITH PREJUDICE
_____

       The Plaintiff, Mitch Goree, brought this action against his employer, United Parcel

Service, Inc. ("UPS"), and two of UPS's employees, alleging employment discrimination based

on race in violation of Title VII of the Civil Rights Act of 1964 and the Civil Rights Act of 1991,

42 U.S.C. § 1981 as amended.  Before the Court is the Defendants' motion for summary

judgment.  (Doc. No. 23.)  The Plaintiff has responded and this motion is ripe for disposition.

For the reasons set forth below, the Defendants' motion for summary judgment is granted.

BACKGROUND

       Goree has worked for UPS for approximately twenty-four years.  (Defs.' Mem. in Supp.

of Mot. for Summ. J., Statement of Facts ("Defs.' Statement of Facts") ¶ 1.)  UPS promoted him

to the position of Supervisor in 1992 and again to the position of Business Manager in 2000.  (Id.

¶¶ 3- 4.)  On January 12, 2004, Goree was demoted from Business Manager back to Supervisor.

(Id. ¶¶ 64-65.)  The Defendants claim that the demotion came as a result of the Plaintiff's poor

job performance. (Defs.' Mem. in Supp. of Mot. for Summ. J. at 1-2.) The Plaintiff contends

that he was a victim of racial discrimination. (Pl.'s Resp. in Opp. at 1-2.) Specifically, Goree's

Complaint charges that the Defendants violated 42 U.S.C. § 1981 by "intentionally subjecting

[Goree] to a racially abusive work environment, retaliation, and disparate treatment . . . ."

(Compl. ¶ 24.) The Plaintiff also claims that the Defendants violated 42 U.S.C. § 2000e et seq.

by subjecting him to disparate treatment "with respect to disciplinary actions and pay while

Plaintiff's similarly situated white counterparts were treated more favorable." (Id.) Last, the

Complaint alleges that the Defendants violated state law, the Tennessee Human Rights Act, "by

intentionally subjecting him to a racially abusive hostile work environment, retaliation, and

disparate treatment . . . ." (Id.) In his response to the Defendants' motion for summary

judgment, the Plaintiff withdrew his retaliation claims. (Pl.'s Resp. in Opp. at 15.)

    The following facts give rise to Goree's hostile work environment claim. In February

2001, Goree's Division Manager, a white female named Debbie Johnson, said to the Plaintiff,

who is African American, "way to go, Buckwheat." (Defs.' Statement of Facts ¶ 5.) She later

apologized to the Plaintiff for the remark. (Id. ¶ 6.) Goree contends that he did not think her

apology was sincere, however, and disbelieved her explanation that she did not know "what

Buckwheat meant to African Americans . . . ." (Pl.'s Resp. in Opp. ¶ 6.) Goree also supports his

hostile work environment claim with several other assertions: 1) in 2001 or 2002, a white

supervisory employee at UPS allegedly used the term "nigger" on several occasions and referred

to an African American employee as a "black motherfucker;" 2) in 2003, a Division Manager

allegedly told a mostly African American group of employees that "they should all be hanged for

their poor performance;" 3) later that same year, Daniel Minesinger, UPS's District Human

Resources Manager for the Mid-South, allegedly threatened to demote or terminate the Plaintiff and refused to grant his request to hire someone to help him implement UPS's Comprehensive Health and Safety Process ("CHSP"); 4) in December 2003, Minesinger allegedly blamed Goree for the mistake of a white employee; and 5) in March 2004, the Plaintiff became aware that another African American employee was allegedly wrongfully terminated. (Pl.'s Resp. in Opp. at 16-18.)

The Plaintiff's demotion claim is based on the following facts. Goree worked as a Business Manager at UPS's Memphis location from April 2003 until August 2003. (Defs.' Statement of Facts ¶ 9.) His Division Manager in Memphis, Cliff Thorman, allegedly thought that the Plaintiff was "weak in planning and organization, important qualities for a Business Manager." (Id. ¶ 10.) Goree disputes this contention and asserts that his employer's dissatisfaction with him first arose after he was transferred to the Hernando and Batesville facilities in August 2003. (Pl.'s Resp. in Opp. ¶ 10.) Nonetheless, the Plaintiff does not deny that, before his transfer in August 2003, he became aware that "individuals other than [Thorman] thought that [he] should be demoted." (Id. ¶ 14.) This is consistent with UPS's assertion that although it considered demoting Goree in August 2003, it instead opted to transfer him to the Hernando and Batesville centers. (Defs.' Statement of Facts ¶ 14.)

On August 25 and 26, 2003, the same month the Plaintiff arrived, the Hernando facility underwent an audit to evaluate its compliance with safety standards. (Id. ¶¶ 18, 20.) Specifically, the audit covers four categories: 1) Comprehensive Self Evaluation ("CSE"); 2) Corporate Settlement Agreement ("CSA"); 3) CHSP; and 4) Lock Out Compliance ("LOC"). (Id. ¶ 20.) A score of 95% of better in each of these categories is considered passing. (Id. ¶ 21.)

The Hernando facility failed the CSE audit in every category. (Id. ¶ 22.) Three months after Goree's arrival, UPS audited the Hernando center again. (Id. ¶ 25.) The facility's new scores dropped several percentage points in each audit division. (Id.)

After the Hernando facility failed the audit the second time, the Plaintiff was requested to complete a Safety Process Improvement Plan ("SPIP"). (Id. ¶ 27.) A SPIP itemizes the safety problems identified in a CSE audit and requires the submission of a "Plan of Action," which outlines the measures that will be taken to remedy any problems and provides a "Planned Date of Completion" for each item. (Id. ¶ 30.) According to the Defendants, Goree submitted his SPIP one day late. (Id. ¶ 29.) The Plaintiff states that he "was not intentionally late," but that he contacted the CHSP Manager to get help in completing the new form and she never returned his calls. (Pl.'s Resp. in Opp. ¶ 28.) Alternatively, Goree claims that the CHSP Manager's advice in regard to the form consisted of "its [sic] cut and dry, just fill it out and send it in." (Id. ¶ 32.)

UPS was dissatisfied with the SPIP Goree submitted. (Defs.' Statement of Facts ¶ 32.) According to the Defendants, some of the tasks listed in the Plaintiff's SPIP had a "Planned Date of Completion" more than ninety days from the date of the audit, even though they could have been completed in far less time. (Id. ¶¶ 31-33.) Goree disputes that this was an excessive amount of time, given that it was peak season for UPS and that the Hernando facility had failed the safety audit during the two years prior to his arrival. (Pl.'s Resp. in Opp. ¶ 33.)

In addition to Goree's alleged difficulties in assisting the Hernando center to pass the audit, UPS complains that the Plaintiff failed to solve a problem affecting one of its major clients, Williams-Sonoma. It is undisputed that in 2003, UPS handled the delivery of parcels from Williams-Sonoma to its customers, as well as returns. (Defs.' Statement of Facts ¶ 36.) In

November 2003, Goree was informed that packages from Williams-Sonoma that were supposed to be mailed to customers were being accidentally returned to Williams-Sonoma by the Hernando facility. (Id. ¶ 37.) A UPS employee who was responsible for ensuring that Williams-Sonoma received appropriate service emailed the Plaintiff about the problem. (Id. ¶ 38.) Goree asserts that the delivery difficulties affected not only the Hernando center, but the entire Memphis area, and continued until as recently as May 22, 2007. (Pl.'s Resp. in Opp. ¶ 38.)

UPS also claims that the Plaintiff failed to adequately manage the time entry process for management employees. During the company's peak season in 2003, Goree had three managers help him at one of his centers. (Defs.' Statement of Facts ¶ 41.) Even though salaried employees, such as managers, are not paid by the hour, the time they spend performing "bargaining unit work," as defined by the collective bargaining agreement UPS has with the Teamsters, must be entered into the Package Timecard Editor ("PTE") system. (Id. ¶¶ 40, 42.) In December 2003, UPS discovered that some of the time entries for the managers working at the Plaintiff's Batesville center had not been entered into the PTE system. (Id. ¶ 44.) The Defendants assert that UPS treats such infractions seriously, but Goree disputes this, contending that a white employee was promoted "after being caught changing time cards" and an African American employee was terminated "following improper allegations of time card changes." (Id. ¶ 45; Pl.'s Resp. in Opp. ¶ 45.) Further, the Plaintiff asserts that it was a white payroll clerk who made the error, not Goree, and that he was not reprimanded by UPS. (Id. ¶ 44.)

Next, the Defendants contend that the Plaintiff mismanaged the "preload" at the Hernando and Batesville facilities.[1]  (Defs.' Statement of Facts ¶ 48.)  Goree disputes this fact, asserting that in the first part of January 2004, the preload productivity goals at those facilities were raised by ten percent over the previous year.  (Pl.'s Resp. in Opp. ¶ 48.)   The Plaintiff also maintains that the problems predated his arrival.  (Id.)  According to UPS, Southwest Division Manager Tom Ragland[2] spoke with Goree about these problems and requested that he provide a plan to deal with them.  (Defs.' Statement of Facts ¶ 49.)  When later asked about the plan, the Plaintiff asserted that it was "in [his] head."  (Id. ¶ 51.)  He subsequently provided a plan that contained only four or five lines.  (Id. ¶ 52.)[3]

According to the Defendants, District Human Resources Manager Daniel Minesinger and District Manager Dwayne Meeks[4] reviewed Goree's job performance after Ragland raised concerns.  (Defs.' Statement of Facts ¶¶ 59-62.)  Minesinger and Meeks recommended that Ragland demote the Plaintiff to Supervisor.  (Id.)  The Defendants assert that this decision was based on the Plaintiff's "CHSP failures, and [Ragland's] personal observation of Plaintiff's failure to address adequately the preload problems - most notably by failing to provide a preload

---

[1] The preload is the morning shift.  Clay v. United Parcel Serv., Inc., 501 F.3d 695, 700 (6th Cir. 2007).  Packages are shipped to the center and then unloaded and sorted. Id.

[2] Ragland is African American.  (Ex. 3 to Pl.'s Resp. in Opp. at 4.)

[3] Goree admits that he was asked to provide a plan to deal with the preload problems and alleges that he prepared an Excel spreadsheet wherein he documented "the hours and number of packages."  (Pl.'s Resp. in Opp. ¶ 50.)  In support, Goree cites his own deposition at pages 200-01.  (Id.)  However, those pages of his deposition were not made part of the record.  (See Defs.' Mem. in Supp. of Mot. for Summ. J. Ex. A; Pl's Resp. in Opp. Ex. 1.)

[4] Meeks is also African American.  (Ex. 3 to Pl.'s Resp. in Opp. at 4.)

plan when asked . . . ." (Id. ¶ 63.) The Plaintiff notes, however, that the decision to demote him came only two weeks into Ragland's tenure as Division Manager. (Pl.'s Resp. in Opp. ¶ 64.) Ragland admits that he had never before demoted anyone after only working with them for two weeks. (Id.)

Last, the Plaintiff's disparate pay claim is based on the fact that he was earning less as a Business Manager than a white Supervisor. In 2001, after being promoted to Business Manager, Goree conducted a salary review for Supervisor John Kreamer. (Defs.' Statement of Facts ¶ 66.) The Plaintiff found that Kreamer was making about $500 a month more than he was. (Id. ¶ 67.) UPS asserts that this disparity can be explained by its system of formal pay grades. According to the Defendants, in each pay grade there are pay ranges. (Id. ¶ 68.) Supervisors are at grade 14 and Business Managers at 16. (Id.) The Defendants claim that it is not unusual for someone at the top of the pay range for grade 14 to earn more than someone who is at the bottom of the pay range for grade 16. (Id.) Goree maintains that he worked for UPS for approximately the same amount of time as Kreamer. (Pl.'s Resp. in Opp. ¶ 68.) However, he acknowledges that UPS determines raises based on various factors, such as performance-based merit and current employee salary. (Id. ¶ 70.)[5]

---

[5] Although Goree, through his new counsel, seeks to introduce new evidence and demands the Court to reopen discovery, the Court has concluded that such a request comes too late and that the case should be considered in its present posture. (See Doc. No. 62, Order Overruling Plaintiff's Objections to Magistrate Judge Diane K. Vescovo's Order Denying Plaintiff's Motion to Reopen Discovery and Allow Supplemental Briefing, entered on January 29th, 2008.)

Rule 56 (c) provides that a

judgment . . . shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Canderm Pharmacal, Ltd. v. Elder Pharms, Inc., 862 F.2d 597, 601 (6th Cir. 1988). In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [his] asserted causes of action." Lord v. Saratoga Capital, Inc., 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing Street v. J.C. Bradford & Co., 886 F.2d 1472, 1478 (6th Cir. 1989)). Finally, the "judge

may not make credibility determinations or weigh the evidence."  Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994).

ANALYSIS

I.    HOSTILE WORK ENVIRONMENT

The Complaint charges that the Defendants violated 42 U.S.C. § 1981 and the Tennessee Human Rights Act by "intentionally subjecting [Goree] to a racially abusive hostile work environment . . . ."  (Compl. ¶ 24.)  The Defendants assert that Goree's hostile work environment claim under both statutes is untimely.  Alternatively, they assert that even if these claims are timely, they fail as a matter of law because the Plaintiff's allegations do not establish a hostile work environment.

Claims of race discrimination brought under 42 U.S.C. § 1981 are reviewed under the same standards as those brought pursuant to Title VII of the Civil Rights Act of 1964.  Jackson v. Quanex Corp., 191 F.3d 647, 658 (6th Cir. 1999) (citations omitted).  In addition, the analysis of a hostile work environment claim is the same under both the Tennessee Human Rights Act and Title VII.  Frye v. St. Thomas Health Servs., 227 S.W.3d 595, 602 (Tenn. Ct. App. 2007).

To establish a hostile-work-environment claim under Title VII, Goree must show that "'(1) [he] was a member of a protected group, (2) [he] was subjected to unwelcome harassment, (3) the harassment was based upon [his] protected status, such as race or gender, (4) the harassment affected a term, condition, or privilege of employment, and (5) the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventive actions.'"  Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 600 (6th Cir. 2007) (quoting Farmer v. Cleveland Pub. Power, 295 F.3d 593, 605 (6th Cir. 2002), abrogated on other grounds by White v. Columbus Metro. Hous. Auth., 429 F.3d 232 (6th Cir. 2005)).  The key test is the

fourth prong, which requires courts to inquire whether "'the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Id. (quoting Farmer, 295 F.3d at 605); Kelly v. Senior Ctrs., Inc., No. 04-4094, 2006 WL 304670, at *4 (6th Cir. Feb. 8, 2006).

The Sixth Circuit has held that employers may create a hostile work environment even when the discriminatory acts or practices are not directed at the plaintiff himself, but at other employees who are members of the same protected group of which the plaintiff is a member. Jackson, 191 F.3d at 661. Thus, "the fact that a plaintiff learns second-hand of a racially derogatory comment or joke by a fellow employee or supervisor can impact the work environment." Id. (internal quotation marks and citation omitted). Additionally, "even though a certain action may not have been specifically racial in nature, it may contribute to the plaintiff's proof of a hostile work environment if it would not have occurred but for the fact that the plaintiff was African American." Id. at 662. Therefore, "a showing of the use of racial epithets in a work environment may create an inference that racial animus motivated other conduct as well." Id. (internal quotation marks and citation omitted).

Viewing the totality of the circumstances, the Plaintiff's hostile work environment claims fail as a matter of law. Goree has alleged only two incidents over a period of four years where he was exposed to or heard about racially derogatory comments being made by employees at UPS: the "Buckwheat" episode in 2001 and the incident in 2001 or 2002 where a white supervisory employee at another facility used the term "nigger" and referred to an African American employee as a "black motherfucker." (See Pl.'s Resp. in Opp. at 16.) By contrast, the comment by a white division manager that a group of employees, who were predominately, but

not exclusively, African American, should be hanged for their poor performance is race-neutral on its face. This statement, unlike calling an African American a pejorative name, is not overtly racist, but may contribute to a hostile work environment if race was the "motivating impulse" for the statement. See Williams v. Gen. Motors Corp., 187 F.3d 553, 565-66 (6th Cir. 1999). There is no evidence, however, that this statement was a reference to the hanging of a particular racial group or that it would not have been made but for the fact that a greater number of the group was African American. First, the statement was not made by either of the employees who allegedly made the overtly racist comments. Compare Jackson, 191 F.3d at 662 (finding that a district court wrongly granted judgment as a matter of law in favor of an employer on a hostile environment claim, in part because it disregarded evidence that one of the employee's coworkers "used a racial epithet against her" and later "brought a false accusation against her . . . after his suspension in the matter"); Williams, 187 F.3d at 559 (reversing a grant of summary judgment in favor of the employer on a hostile environment claim when at least some of the employees who made overtly sexist comments also engaged in the non-sexual harassing behavior). Second, the remark was made to an audience that consisted of both African Americans *and* whites, thus reducing the likelihood that the motivating impulse behind the statement was race. Therefore, neither this Court, nor the Plaintiff, can reasonably infer that the comment about hanging was motivated by racial hostility.

Similarly, the allegations that Goree was threatened with termination or demotion after the safety audit failure in August 2003, that he was refused the help he believed he needed to rectify the situation and that he was blamed for the mistake of a white employee are race-neutral. (See Pl.'s Resp. in Opp. at 16-17.) In this case, there can be no inference that these race-neutral

incidents were racially motivated either, given that they seem to be wholly unrelated to the overt acts of racism alleged in this case. It was Minesinger, who threatened the Plaintiff with termination and refused to let him hire someone to help with the CHSP process, not Debbie Johnson, nor the white supervisory employee who used the racial term. Compare Jackson, 191 F.3d at 662. Thus, Minesinger's actions do not appear to have been motivated by racism, nor does it appear that they would not have taken place but for the fact that the Plaintiff is African American.

Last, while the Court may consider discriminatory practices against other employees who are members of the same protected group as the Plaintiff, Goree's assertion that another UPS employee, Judon Roper, was fired because of his race is simply based on speculation. (See Pl.'s Resp. in Opp. at 17-18.) Even if true, the improper firing of one employee at another facility, combined with the fact that over the course of four years, two UPS employees, one of whom worked at another facility, made racially derogatory comments, does not create a workplace that "is *permeated* with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Michael, 2007 WL 2176220, at *13 (quotation omitted) (emphasis added). Rather, these incidents seem isolated, particularly in comparison with cases where the Sixth Circuit has held that a hostile work environment did exist. See, e.g., Pollard v. DuPont de Nemours, 213 F.3d 933 (6th Cir. 2000), rev'd on other grounds, 532 U.S. 843 (2001) (hostile work environment was established where male employees refused to accept orders from the female plaintiff; she was exposed to daily use of sexual slurs; male employees played tricks on her, like burning her food and slashing her bicycle tires; and one male employee repeatedly showed the plaintiff biblical verses that stated that women should be submissive); Jackson, 191

F.3d 647 (holding the district court erred in granting summary judgment where, among other things, supervisors routinely used the word "nigger" and other racial slurs and joked about placing stars on their helmets for firing minority employees; the workplace had graffiti stating "KKK is back," "Blacks out back" and depicting lynchings; a white worker wore a had hat with a swastika to work and a worker's shirt was defaced with the slur "Nigger Sucker").  Thus, even if the Court considered the claims to be timely and the allegations to be true, the Plaintiff has failed to establish that he was exposed to a hostile work environment under the circumstances alleged.  See Clark v. United Parcel Serv. Inc., 400 F.3d 341, 352 (6th Cir. 2005) (holding that a male supervisor's actions toward a female employee did not created a hostile work environment when she "alleged only three relatively isolated incidents over a period of approximately two and a half years."); Burnett v. Tyco Corp., 203 F.3d 980, 984 (6th Cir. 2000), cert. denied 531 U.S. 928 (2000) ("[T]he occurrence of the three allegations [of sexual harassment] over [a] six-month period does not give rise to a genuine issue of material fact as to whether the conduct was sufficiently pervasive to create a hostile work environment.").

II.      DISPARATE TREATMENT

The Complaint further charges that the Defendants violated 42 U.S.C. § 1981 by "intentionally subjecting [Goree] to . . . disparate treatment . . . ."  (Compl. ¶ 24.)  The Plaintiff also claims that the Defendants violated Title VII by subjecting him to disparate treatment "with respect to disciplinary actions and pay while Plaintiff's similarly situated white counterparts were treated more favorable."  (Id.)  Last, the Complaint alleges that the Defendants violated the Tennessee Human Rights Act "by intentionally subjecting him to . . . disparate treatment . . . ."

(Id.)[6]

A plaintiff may establish a prima facie case of race discrimination under Title VII by proffering either direct or circumstantial evidence.  Abdulnour v. Campbell Soup Supply Co., 502 F.3d 496, 501 (6th Cir. 2007).  Because Goree presents only circumstantial evidence of discrimination, the Court shall analyze the claim under the McDonnell Douglas burden-shifting approach.  Clay, 501 F.3d at 703.  "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the McDonnell Douglas inquiry"  Id. (quotation marks and citations omitted).  Under that approach, the Plaintiff must first establish a prima facie case of discrimination by showing that: "(1) he [or she] was a member of a protected class; (2) that he [or she] suffered an adverse employment action; (3) that he [or she] was qualified for the position; and (4) that a person outside the protected class was treated more favorably than him [or her]."  Id. (quotation marks and citation omitted).

If Goree successfully establishes a prima facie case of discrimination, the burden shifts to the Defendants to provide a legitimate, non-discriminatory reason for the employment decision.  Abdulnour, 502 F.3d at 502.  Finally, if the Defendants meet their "burden of articulation," the burden shifts back to the Plaintiff to show that the Defendants' proffered reason is merely pretextual.  Id.

_____

[6] As stated above, claims of race discrimination brought under 42 U.S.C. § 1981 are reviewed under the same standards as those brought pursuant to Title VII of the Civil Rights Act of 1964.  Jackson, 191 F.3d at 658 (citations omitted).  In addition, the analysis of disparate treatment claims is the same under both the Tennessee Human Rights Act and Title VII.  See Frye, 227 S.W.3d at 609-610 (applying the McDonnell Douglas framework to an age discrimination claim).

a.    <u>Demotion</u>

In this case, the Defendants argue that the Plaintiff was demoted due to the fact that he "was not qualified for the position of Business Manager because he did not perform up to UPS' legitimate expectations."  (Defs.' Mem. in Supp. of Mot. for Summ. J. at 17.)   Because courts cannot use a defendant's nondiscriminatory reason to assess whether a plaintiff has established a prima facie case of discrimination, <u>Cline v. Catholic Diocese of Toledo</u>, 206 F.3d 651, 660-663 (6th Cir. 2000), the Court will presume that Goree has satisfied his burden at the prima facie stage and moves to the third stage of the <u>McDonnell Douglas</u> test, which requires it to determine whether the Defendants' reason for demoting Goree was legitimate and non-discriminatory.

The bases UPS presented for demoting the Plaintiff were: 1) the fact that the Hernando facility failed two safety audits while Goree was the Business Manager there; 2) Goree's inability to adequately address the preload problems or provide a satisfactory preload plan;[7] 3)

_____

[7] The Plaintiff contends that this Court cannot consider his alleged difficulties with the preload because the Defendants did not raise this issue in their Response to the EEOC's Request for Information.  (Pl.'s Resp. in Opp. at 19-20.)  Goree cites <u>Ohio & Mississippi Railway Co. v. McCarthy</u>, 96 U.S. 258, 267-68 (1878) for the proposition that parties are estopped from giving reasons for their conduct if they failed to assert those reasons prior to the commencement of litigation. In <u>McCarthy</u>, the Supreme Court stated that "[w]here a party gives a reason for his conduct and decision touching any thing involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration." <u>Id.</u> However, this so-called "mend the hold doctrine" traditionally applies only to contract suits.  <u>See</u> <u>Habor Ins. Co. v. Cont'l Bank Corp.</u>, 922 F.2d 357, 362-65 (7th Cir. 1990) ("[I]t is the name of a common law doctrine that limits the right of a party to a contract suit to change his litigating position.").  Both Tennessee cases cited by the Plaintiff in support of this doctrine involve contract disputes.  <u>See</u> <u>Loftis v. Stuyvesant Ins. Co.</u>, 390 S.W.2d 722 (Tenn. Ct. App. 1965); <u>Nashville Marketplace Co. v. First Capital Inst. Real Estate</u>, No. 89-144-11, 1990 WL 33373 (Tenn. Ct. App. March 28, 1990).  Because this is a suit involving employment discrimination, the Court will not apply the doctrine in this context.  <u>See</u> <u>Paige v. Kemp</u>, No. 77 C 3950, 1992 WL 249609, at *2 (N.D. Ill. Sept. 25, 1992) (stating that the primary obstacle to the application of the "mend the hold" doctrine to a wrongful termination case is that it is not a contract case); <u>but see</u> <u>Hsieh v. R.R. Donnelley & Sons Co.</u>, No. 04 C 5956, 2006 WL 3469539, at *4 & n.3 (N.D. Ill. Nov. 30, 2006) (noting that when an employer offers shifting explanations for an

his failure to address the problem of packages from Williams-Sonoma being misrouted; and 4)

his failure to ensure that management time cards were properly entered during peak season.

(Defs.' Mem. in Supp. of Mot. for Summ. J. at 17.)  Because the Defendants have articulated

legitimate and nondiscriminatory reasons for Goree's demotion, the Plaintiff  "must produce

sufficient evidence from which the jury may reasonably reject the employer's explanation."

Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1083 (6th Cir. 1994).  Goree can do

so by showing that the Defendants' reasons (1) have no basis in fact, (2) did not actually

motivate the demotion, or (3) were insufficient to warrant the demotion.  Abdulnour, 502 F.3d at

502 (citing Manzer, 29 F.3d at 1084).

> In Manzer, the Sixth Circuit held that
>
> > [t]he first type of showing is easily recognizable and consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.,* that they are "factually false."  The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. These two types of rebuttals are direct attacks on the credibility of the employer's proffered motivation for firing plaintiff and, if shown, provide an evidentiary basis for what the Supreme Court has termed "a suspicion of mendacity."

29 F.3d at 1084 (internal citation omitted).  By contrast, the second showing involves an indirect

attack on the credibility of the employer's explanation.  Id.  Under the second prong, plaintiffs

argue "that the sheer weight of the circumstantial evidence of discrimination makes it 'more

likely than not' that the employer's explanation is a pretext, or coverup."  Id.  This requires that

plaintiffs introduce additional evidence of discrimination, beyond what is required to establish a

prima facie case.  Id.

--------

employee's termination, it can create a question of fact as to whether any of those rationales was
the honest reason for the firing, a principle that is not dissimilar from the "mend the hold"
doctrine employed in contract actions).

In this case, the Plaintiff does not address the <u>Manzer</u> prongs in turn, but simply argues that "reasonable jurors may believe that the reasons put forward by the Defendant for Mr. Goree's demotion is unbelievable, has no basis in fact, and is accompanied by a suspicion of mendacity, [lying]." (Pl.'s Resp. in Opp. at 19.) The Court shall thus analyze the Plaintiff's arguments under all three <u>Manzer</u> prongs. Under all of the approaches, the Plaintiff bears the burden of producing enough evidence for a jury to reasonably reject UPS's explanation and infer that the company intentionally discriminated against him. <u>Johnson v. Kroger</u>, 319 F.3d 858, 866 (6th Cir. 2003).

        i.       <u>Whether Defendants' Reasons Have No Basis in Fact</u>

Goree has put forth no evidence that indicates that the proffered reasons for his discharge did not occur or that the Defendants disbelieved those reasons. He admits that the Hernando center failed two safety audits while he was the Business Manager there. (Pl.'s Resp. in Opp. ¶¶ 22, 25.) He also concedes that he listed a completion date ninety days into the future for all tasks on the SPIP, without differentiating between tasks that might take less time and those that might take more. (<u>Id.</u> ¶ 33.) Goree acknowledges that during his tenure as Business Manager, packages sent by one of UPS's largest clients were routinely misrouted. (<u>Id.</u> ¶ 38.) The Plaintiff further does not dispute that in December 2003, time entries for managers working at his Batesville facility were not been properly entered into the PTE system. (<u>Id.</u> ¶ 44.) Goree does contest the Defendants' assertion that his Division Manager, Tom Ragland, approached him about problems with the preload, but admits that Ragland asked him for a plan to deal with those problems. (<u>Id.</u> ¶ 49.) He also concedes that when he was later asked where the plan was, he responded that it was in his head. (<u>Id.</u> ¶ 51.) The Plaintiff simply maintains that reasonable

17

jurors could find that the foregoing facts could not have formed the basis of his demotion. (Id. at 19-21.) That argument, however, is properly addressed by the last two Manzer prongs. Thus, the Court concludes that the legitimate and nondiscriminatory reasons for the Plaintiff's demotion put forth by the Defendants have a basis in fact. See Smith v. Leggett Wire Co., 220 F.3d 752, 759 (6th Cir. 2000) (holding that an employee did not establish first Manzer prong when he admitted the conduct that formed the alleged basis for his termination).

ii. Whether Defendants' Reasons Did Not Actually Motivate the Challenged Conduct

The Plaintiff provides several arguments for why each of the Defendants' proffered reasons for his demotion might not be believed by a jury. The Court shall address them each in turn.

First, Goree argues that the fact that his facility failed two safety audits could not have formed the basis for his dismissal. (Pl.'s Resp. in Opp. at 19.) The Plaintiff contends that the August 2003 audit was performed the same month he arrived, meaning he could not reasonably have been held responsible for the results. However, disregarding the safety audit undertaken at the Hernando facility in August 2003, it is undisputed that the facility failed a second audit conducted three months *after* his arrival, and that the scores were lower in every category. (Id. ¶ 25.) The Plaintiff asks the Court to infer from the timing of the second audit, which was conducted shortly after he filed a request for an additional employee to help with the CHSP process, that it was "a setup to cause Mr. Goree's facilities to fail," but submits no proof to support such an inference. (Id. at 19.) The most probative evidence Goree presents that the failed safety audits were mere pretext is the testimony by one of UPS's preload managers, Michael Darling, who states that he knows of no other employee who has been demoted as a

18

result of failing such an audit. (Darling Dep. at 51.) However, UPS has never claimed that it demoted the Plaintiff *solely* because his facilities failed the safety audit. Rather, the Defendants insist that it was the "combination and culmination of multiple performance problems that formed the basis for his demotion." (Defs.' Reply at 9.) The fact that Goree's demotion did not occur until approximately six weeks after the last failed audit supports this claim.

Next, Goree claims that a jury could reasonably find that his mishandling of Williams-Sonoma packages could not have formed part of the reason for his demotion, because Williams-Sonoma packages only make up 6-8% of the total volume at the Hernando and Batesville facilities. (Pl.'s Resp. in Opp. at 19.) However, the Plaintiff does not dispute that one of UPS's largest accounts in the area is with Williams-Sonoma. (Id. ¶ 35.) Thus, although these parcels may comprise less than 10% of the total volume at the facilities where Goree was the Business Manager, it would not be beyond conjecture that UPS might discipline an employee whose lack of oversight jeopardized its relationship with such an important client. The Plaintiff further contends that the problems with Williams-Sonoma packages being misrouted are still ongoing, but that the person responsible for the account, Michael Darling, has not been disciplined. (Id. at 20.) Although Darling has not yet been reprimanded, however, he admits that he has been "talked to" about the problem. (Darling Dep. at 52.) Furthermore, because Darling is African American, the fact that he has not been disciplined is not an example of disparate treatment. It demonstrates, at best, that UPS might have been unfair to only punish Goree, and not Darling, for the misrouting of the Williams-Sonoma packages, not that he was treated differently on account of his race.

The Plaintiff also asserts that reasonable jurors might believe that the time card issue could not form a basis for his demotion. (Pl.'s Resp. in Opp. at 20.) First, Goree contends that a

19

white subordinate, Bradley Alexander, was responsible for the error and that, unlike the Plaintiff, he was never reprimanded by UPS for the incident.  (Id. ¶ 44.)  Alexander and Goree are not similarly situated, however, because they do not deal with the same supervisors.  See Harrison v. Metro. Gov't of Nashville, 80 F.3d 1107, 1116 (6th Cir. 1996), overruled on other grounds by Jackson, 191 F.3d at 667 ("The plaintiff must also demonstrate that the non-minority employees to be compared with himself were similarly-situated in all respects.  Accordingly, the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.").  Alexander is described both as a "white part time supervisor" and a "white payroll clerk," (compare Pl.'s Resp. in Opp. at 20 with id. ¶ 44), who reported to a Supervisor named Buddy Reaves, not Minesinger or Ragland.  (Id. at 21.) Furthermore, while Alexander may not have been demoted as a result of his mistake, the record reveals that UPS did take the incident seriously.  Alexander had to submit a statement to the company describing how the mistake was made and affirming that he understood that "no time card can be deleted unless [it is a] duplicate time card."  (Pl.'s Resp. in Opp. Ex. 9.)

Goree contends that two other employees were accused of improperly handling time cards.  The first, Jim Swan, a white employee, was promoted, while the second, an African American employee named Judon Roper, was fired.  (Pl.'s Resp. in Opp. ¶ 45.)  Still, the Plaintiff provides no facts that would allow the court to determine whether Jim Swan was a similarly situated employee or whether his conduct was similarly serious.  See Harrison, 80 F.3d at 1116; see also Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (stating that to be similarly situated, employees must have engaged in conduct that was of comparable seriousness).

Last, the Plaintiff notes that UPS failed to mention the preload issue in its Response to

the EEOC's Request for Information and argues that a jury "may believe that the issue with regard to pre-load was left out of the position statement in and of itself is pretext for discrimination." (Pl.'s Resp. in Opp. at 20.) Goree also claims that in January 2006, six of eight facilities were not up to standard with regard to preload. (Id.) In light of the other complaints about the Plaintiff's performance, however, this is very weak circumstantial evidence that the demotion was motivated by race. This argument also overlooks the fact that the Defendants' frustration with Goree stemmed not only from the preload problem, but also from the fact that the Plaintiff ignored Ragland's request that he draft a plan to combat the problem. (Defs.' Statement of Facts ¶¶ 49-52; Ragland Dep. at 42-44.) Thus, the Plaintiff has not shown that there is a material issue of fact as to whether the Defendant's proffered reasons did not motivate his demotion.

   iii.  <u>Whether Defendants' Reasons Were Insufficient to Warrant the Challenged Conduct</u>

   As stated above, this prong is ordinarily satisfied by providing "evidence that other employees, particularly employees not in the protected class, were not [demoted] even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." <u>Manzer</u>, 29 F.3d at 1084. Such employees must be similarly situated. <u>Harrison</u>, 80 F.3d at 1116. The most probative evidence Goree presents is Darling's testimony that in the two years during which Minesinger was the District Human Resources Manager, four or five African American managers were demoted, but no white managers. (Darling Dep. at 43.) Unfortunately, the Plaintiff provides no details that would allow the Court to determine whether the managers who were not demoted were similarly situated or whether the number of demoted managers represents a disproportionate number of African American

managers. The Plaintiff also does not allege that the demoted African American managers were replaced by white managers. Furthermore, the decision to demote Goree was not Minesinger's alone. Ragland, an African American who became Division Manager in January 2004, called Minesinger to discuss his concerns with Goree's performance. (Ragland Dep. at 58-59.) Minesinger then mentioned Ragland's concerns with District Manager Dwayne Meeks, who is also African American. (Id. at 59; Minesinger Dep. at 70-72). Only then was the decision made to demote the Plaintiff. (Ragland Dep. at 59-60.) Because two of the three UPS employees involved in the decision to demote the Plaintiff were of the same race as he, it is unlikely that the decision to demote Goree stemmed from Minesinger's alleged racial animus. Accordingly, the Court concludes that Goree has not effectively attacked the credibility of the Defendants' proffered explanation for his demotion under the third Manzer prong.

Because the Plaintiff has failed to produce sufficient evidence from which a jury may reasonably reject the Defendants' legitimate and nondiscriminatory reasons for Goree's demotion, the Court denies Goree's claims that he was subject to disparate treatment with respect to disciplinary actions. See Manzer, 29 F.3d at 1083.

b.      Pay

In order to prevail on his disparate pay claim, the Plaintiff must first establish a prima facie case of discrimination by showing that: "(1) he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that a person outside the protected class was treated more favorably than him." Braithwaite v. Timken Co., 258 F.3d 488, 493 (6th Cir. 2001). The Sixth Circuit requires "that the plaintiff demonstrate that he or she is similarly situated to the non-protected employee in all *relevant* respects." Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 353 (6th Cir. 1998) (emphasis in the original). The Defendants argue that Goree's claim fails at the prima facie

stage, because the employee who allegedly received more favorable treatment is not similarly situated.

The Plaintiff alleges that he was paid less than a white Supervisor, John Kreamer. (Pl.'s Resp. in Opp. at 22.) Goree testified that he and Kreamer "worked at the company for the same number of years basically." (Goree Dep. at 51.) However, Goree could not remember whether he and Kreamer were promoted to Supervisor at around the same time. (Id.) Because Kreamer might have become a Supervisor at some time before Goree, the Plaintiff has not shown that Kreamer was similarly situated and, thus, has failed to establish a prima facie case of discrimination.

Even if the Court were to assume that Kreamer was similarly situated, the Defendants have provided a legitimate, non-discriminatory reason for the difference in his and Goree's pay, which the Plaintiff has failed to rebut. As stated above, UPS has a formal pay grade system, which is divided into pay ranges. (Defs.' Statement of Facts ¶ 68.) Pay raises are determined by a combination of factors, such as performance-based merit and current employee salary. (Id. ¶ 70.) When the Plaintiff discovered that Kreamer made more than he did, Kreamer was only a grade 14, while Goree was a grade 16. (Goree Dep. at 51.) At his deposition, the Plaintiff admitted, however, that pay "ranges overlap between pay grades." (Id. at 52.) Thus, it is possible for a Supervisor to earn more than a Business Manager at UPS, without racial discrimination playing any role. Because the Plaintiff has provided no evidence to rebut the Defendants' legitimate, non-discriminatory reason for the disparity in Goree and Kreamer's pay, the Court finds that the Plaintiff's pay claim fails.

<u>CONCLUSION</u>

For the reasons articulated herein, the Court **GRANTS** the Defendants' motion for summary judgment and **DISMISSES** this action with prejudice.

**IT IS SO ORDERED** this 30th day of January, 2008.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE